# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 11CR671 WQH |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| MICHAEL CAREY, | |
| Defendant. | |

HAYES, Judge:

The matter before the Court is the motion to suppress wiretap evidence (ECF No. 57) remanded to this Court on an open record by the Court of Appeals for the Ninth Circuit.

## BACKGROUND

On October 4, 2016, the Court of Appeals for the Ninth Circuit vacated the order denying Defendant's motion to suppress evidence obtained from wiretaps and remanded "on an open record to determine what evidence was lawfully obtained in 'plain hearing.'" *United States v. Carey*, 836 F.3d 1092, 1094 (9th Cir. 2016). The Court of Appeals stated:

> [B]ecause the order did not authorize agents to listen to Carey or his associates, the government may only use evidence obtained in accordance with the "plain hearing" doctrine discussed above.
>
> The record does not indicate what evidence was obtained before the agents knew or should have known that they were listening to calls outside of the Escamilla conspiracy.

*Id.* at 1098. On remand, the parties agreed that the court would hold an evidentiary

hearing to determine whether the FBI agents knew or reasonably should have known that the calls intercepted on T-14 during the period March 10, 2010 to March 17, 2010 were unrelated to the Escamilla conspiracy.

On April 16, 2018, after lengthy delay to accommodate Defendant's discovery request, the Court set an evidentiary hearing for May 30, 2018 with the agreement of both sides. (ECF No. 328).

On May 30, 2018 and July 6, 2018, the Court held the evidentiary hearing.

**FACTS**

FBI Special Agent Meltzer was assigned to the Cross Border Violence Task Force focused on drug-related violent crimes in 2009 and 2010. Agent Meltzer testified that he was the case agent for the investigation of a drug-trafficking group called the Heredia-Escamilla Organization, led by Armando Villareal-Heredia, who resided in Tijuana, Mexico. In February 2010, federal authorities obtained the first federal order to tap phones as part of the investigation. On March 5, 2010, federal authorities obtained a second order to tap phones for the investigation, including T-14 believed to be used by Escamilla Estrada. Meltzer was the affiant on the wiretap. Agent Meltzer stated in the affidavit in support of the wiretap application, and testified at the evidentiary hearing, that an informant had consensually recorded more than forty calls with Escamilla Estrada at the T-14 number from February 9, 2010 to March 4, 2010.

Agent Meltzer testified that the first intercepted call on T-14 occurred on March 10, 2010 in the English language with the speaker stating that this was "Mr. Keys' new number." Meltzer testified that the calls subsequently intercepted on T-14 were in the Spanish language. Agent Meltzer testified that he believed the calls intercepted on T-14 clearly concerned drug-trafficking. Meltzer testified that the investigators concluded at some point that Escamilla Estrada was not using T-14 and that they did not know the identity of the new user. Agent Meltzer testified that he thought the investigation had found a previously undiscovered aspect of the subject drug trafficking as often happens

during wiretap investigations.

Agent Meltzer testified that the interceptees from T-14 were smuggling narcotics from Mexico to the United States and transporting currency to Mexico consistent with the activity under investigation in the Escamilla conspiracy. Agent Meltzer testified that it did not occur to him that the callers and calls on T-14 could be entirely unrelated to the target investigation because Escamilla Estrada had used T-14 as recently as the day before the court signed the second wiretap order. Agent Meltzer testified that he had information that the target conspiracy members were expected to change their phones every twenty-thirty days to avoid detection by law enforcement and that several phones in the target group, including the phone of Heredia, were used longer than thirty days.

Agent Meltzer testified that he was aware of cases where drug traffickers gave phones, sometimes temporarily, to associates in their criminal activity. Agent Meltzer testified that he had never heard of or contemplated a situation where a drug trafficker acquired and used a phone just discarded by a completely unaffiliated drug trafficker, during a period of time when law enforcement was authorized to intercept calls on that phone. Agent Meltzer testified that he spoke with the prosecutor assigned to the investigation after concluding that Escamilla Estrada was not using T-14, and after intercepting calls indicating that T-14 was still being used to facilitate drug trafficking. Agent Meltzer testified that he recalled the prosecutor indicating that interceptions on T-14 could continue.

Agent Adkins of the Drug Enforcement Agency (DEA) testified that he was part of the Cross Border Violence Task Force during the Escamilla investigation. Agent Adkins testified that a surveillance log dated March 15, 2010 showed that five law enforcement representatives were a part of a surveillance team that followed a car and driver from the San Diego area up to Irvine and back to a residence in Chula Vista. Agent Meltzer testified that calls intercepted on T-14 on March 15, 2010 suggested that an unknown male would enter the United States, possibly with a drug load. Agent

Meltzer testified that the calls on T-14 led to the surveillance by Agent Adkins and the surveillance team. Agents later identified the driver as Adrian Madrid, a codefendant later prosecuted with Defendant Carey.

Agent Meltzer testified that calls intercepted on T-14 led to a stop of a vehicle and the seizure of $688,000 in U.S. currency as well as a search warrant for a residence in Irvine where 17 kilograms of cocaine were found on March 17, 2010. Agent Meltzer testified that the user of T-14 stopped using the phone on that same day. Agent Meltzer testified that he learned later that persons intercepted on T-14 and detained during the stop and search might be linked to an investigation conducted by agents for Homeland Security Investigations (HSI). Agent Meltzer testified that he met with HSI Agent Krall the day after the March 17 seizure. Agent Meltzer testified that he did not know Agent Krall prior to the meeting and that he had not been aware of the HSI investigation. Agent Meltzer testified that no overlap was discovered between his investigation and the Homeland Security investigation, other than the calls on T-14 and the March 17, 2010 stop and search.

Defendant Carey testified at the evidentiary hearing that he went to a cell phone storefront vendor located in Tijuana, Mexico on March 10, 2010 to purchase multiple new prepaid cell phones that would operate in both the United States and Mexico. Carey testified, "One of the phones I purchased had the number (619) 740-9230, which unbeknownst to me had been designated T-14 by the government in the wiretap order obtained on or about March 5, 2010 as part of the government's investigation of Ignacio Escamilla Estrada . . . , an investigation that had nothing to do with me or the associates later indicted with me." (ECF No. 337 at 2). "At 2:02 pm I used T-14 to call another phone to make sure they were in good working order. This test call is documented in a transcript of the call produced to me by the government as part of discovery." *Id.* Carey testified that he was not advised by the vendor that the number assigned to T-14 had been recycled in the previous days from a different handset. Carey testified that he left the phone in the possession of codefendant Jose Hernandez in Tijuana, Mexico on

March 10, 2010 and returned to the United States.

HSI Agent Krall was affiliated with the Border Enforcement Security Task Force in approximately April of 2009 and began investigating a drug trafficking case that involved Defendant Carey and others. Agent Krall testified that he was aware of Carey and codefendants Adrian Madrid and Javier Lacarra. Agent Krall testified that he was not aware of Jose Hernandez. Agent Krall testified that "the MO of the organization was to cross the border with a spare tire loaded with . . . cocaine." (ECF No. 347 at 22). Agent Krall testified that he drew links to Carey from the arrest of Francisco Noriega in Mexico. Agent Krall wrote in a report that the investigation targeted "international drug smuggling cells with ties to firearms and bulk cash smuggling." *Id*. at 25. Agent Krall testified that his task force investigation included primarily HSI and DEA, and that ATF played a minor role. Agent Krall testified that he wrote reports and placed information into his agency database during the investigation sharing information with the investigating team.

Agent Krall testified that he installed a tracking device on Defendant Carey's vehicle early in 2010 and that the tracking device showed that Carey traveled to Irvine on February 21, 2010 and February 22, 2010.

Agent Krall testified that he learned of the March 17, 2010 seizure of drugs and money in the evening after the seizure. Agent Krall testified that he met with Agent Meltzer a day or two after the seizure. Agent Krall testified that prior to March 17, 2010, he did not know about the Irvine residence where the drugs were seized, he had not shared any information with Agent Meltzer, and he had not involved the FBI in his investigation at all.

### CONTENTIONS OF THE PARTIES

Defendant Carey contends that Agent Meltzer knew or should have known well before the wiretap on T-14 went live on March 5, 2010 that there would be non-Escamilla target group speakers. Defendant asserts that any attempt at minimization would have quickly led the agents to conclude that the intercepted calls on T-14 were

not pertinent to the Escamilla warrant. Defendant asserts that "the Escamilla co-conspirators communicated exclusively in Spanish and the Carey co-conspirators did not." (ECF No. 351 at 10). Defendant asserts that Agent Meltzer's familiarity with the violent drug trafficking methods of the Escamilla group should have led the agent to the conclusion that the calls intercepted on T-14 were unrelated to the Escamilla conspiracy. Defendant asserts that substantial overlap with the investigation of HSI Agent Krall establishes that Agent Meltzer realized at least as early as March 15, 2010 that the target of his wiretap was not Escamilla but rather Carey and his coconspirators. Defendant asserts that Agent Meltzer knew that the Escamilla targets utilized a "use and drop" policy regarding cell phones. Defendant asserts that there was no reason for him to believe that there would be a wiretap on a new phone that he purchased in a sealed box.

Plaintiff United States contends that agents were unable to conclusively determine whether Carey or others intercepted on T-14 from March 10, 2010 to March 17, 2010 were involved in the activities targeted by the Cross Border Task Force. Plaintiff United States asserts that Agent Melzer and Agent Krall did not find any overlap between their investigations beyond the T-14 intercepts and the March 17 seizures but never concluded that the persons intercepted on T-14 were not a part of the Escamilla organization. Plaintiff United States asserts that the agents had no reason to question whether the drug dealings on T-14 were connected to the Escamilla target prior to the March 17 seizures and the stop of the intercepts on T-14. Plaintiff United States asserts that the agents had no reason to suspect or conclude that an unrelated drug trafficker had acquired and used a discarded tapped phone. Plaintiff United States asserts that Agent Meltzer reasonably concluded that Escamilla Estrada had given the phone to an unidentified associate in the Escamilla conspiracy.

## APPLICABLE LAW

> The Fourth Amendment provides an exception to the warrant or probable cause requirement when police see contraband in "plain view." We adopt a similar principle today and hold that the police may use evidence obtained in "plain hearing" when they overhear speakers unrelated to the

> target conspiracy while listening to a valid wiretap, without having complied with the Wiretap Act requirements of probable cause and necessity as to those specific speakers. However, the agents must discontinue monitoring the wiretap once they know or reasonably should know that the phone calls only involved speakers outside the target conspiracy. *Cf. Maryland v. Garrison*, 480 U.S. 79, 87, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987).

*Carey*, 836 F.3d at 1093–94. In *Maryland v. Garrison*, the police officers obtained a search warrant for McWebb's apartment. 480 U.S. at 80. At the time the officers obtained the search warrant, the officers "reasonably believed that there was only one apartment on the premises described in the warrant. In fact, the third floor was divided into two apartments, one occupied by McWebb and one by respondent Garrison." *Id.* After entering Garrison's apartment and finding heroin, cash, and drug paraphernalia, the officers realized that the third floor contained two apartments and discontinued the search. At the time of the search, "[a]ll of the officers reasonably believed that they were searching McWebb's apartment." *Id*. at 81. In deciding whether to suppress the evidence the officers found in Garrison's apartment, the Supreme Court stated that "we must judge the constitutionality of their conduct in light of the information available to them at the time they acted." *Id*. at 85. The Supreme Court concluded:

> If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to McWebb's apartment. Moreover, as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant. The officers' conduct and the limits of the search were based on the information available as the search proceeded. . . .
>
> [T]he validity of the search of respondent's apartment pursuant to a warrant authorizing the search of the entire third floor depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable. Here it unquestionably was. The objective facts available to the officers at the time suggested no distinction between McWebb's apartment and the third-floor premises.

*Id.* at 86–88.

## RULING OF THE COURT

In this case, the Court must determine whether the "agents knew or should have

known that they were listening to calls outside of the Escamilla conspiracy." *Carey*, 836 F.3d at 1098. This determination must be made "in light of the information available to them at the time they acted." *Maryland v. Garrison*, 480 U.S. at 85.

Agent Meltzer obtained authorization to intercept the calls on T-14 by an order issued on March 5, 2010. Agent Meltzer reasonably believed that calls on T-14 were associated with the Heredia-Escamilla target investigation based upon information that an informant had consensually recorded more than forty calls in the Spanish language with Escamilla Estrada at the T-14 number from February 9, 2010 to March 4, 2010. There were no calls on T-14 for five days. On March 10, 2010, the initial call was in the English language with the speaker stating that this was "Mr. Keys' new number." The calls subsequently intercepted on T-14 from March 10, 2010 to March 17, 2010 were in the Spanish language. The calls between March 10, 2010 and March 17, 2010 were related to the smuggling of narcotics from Mexico and the transportation of currency to Mexico, consistent with the target investigation.

Prior to March 17, 2010, Agent Meltzer was informed that the person using T-14 was not Ignacio Escamilla Estrada and that the calls remained consistent with the criminal activity under investigation. Agent Meltzer continued to reasonably believe that the person using T-14 was affiliated with the known targets or a person who was part of the Escamilla conspiracy. In light of the information available to Agent Meltzer prior to March 17, 2010, Agent Meltzer reasonably believed that the T-14 calls were related to the Escamilla investigation. Agent Meltzer did not know and had no reason to know that the person using T-14 from March 10, 2010 to March 17, 2010 could be unrelated to the Escamilla conspiracy. Agent Meltzer had no way to know that a phone with the T-14 number was for sale at a cell phone storefront vendor located in Tijuana on March 10, 2010. Agent Meltzer had no way to know that a purportedly unrelated drug dealer had purchased a phone with the T-14 number and used the phone to sell controlled substances in a conspiracy unrelated to the Escamilla conspiracy.

On March 17, 2010, Agent Meltzer learned that the information intercepted from

the T-14 line led to the drug seizure at the Irvine residence, and that the associated individuals could be linked to a separate investigation conducted by HSI Agent Krall. This link was confirmed two days later when Agent Meltzer met with DEA and HSI agents, and it was determined that there was no additional overlap between the two investigations. No communications were intercepted on T-14 after the agent determined that the two investigations were separate. There were no interceptions on the T-14 line after any agent knew or should have known that the phone calls on the T-14 line could involve callers outside the scope of the Escamilla conspiracy and the scope of the wiretap order.

The testimony provided by Agent Meltzer and Agent Krall was entirely consistent and credible. The agents worked separate investigations. There is no evidence that Agent Meltzer or Agent Krall were aware of any overlap between their investigations or should have been aware of any overlap. The March 15, 2010 surveillance did not provide any facts to indicate that T-14 was not being used by the Escamilla organization. The "objective facts available to [the agents prior to March 17, 2018] suggested" that T-14 continued to be used by the Escamilla conspirators. *See Maryland v. Garrison*, 480 U.S. at 88. The agents did not know and had no reason to know that the person speaking on the tapped line was not involved in the target conspiracy. The Court concludes that the agents were not required to cease the wiretap and the motion to suppress the evidence is denied.

In this case, Defendant entered a conditional guilty plea pursuant to Fed. R. Crim. P 11(a)(2) which states:

> With the consent of the court and the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specific pretrial motion. A defendant who prevails on appeal may then withdraw the plea.

Fed. R. Crim. P 11(a)(2). The "specific pretrial motion" reserved for appeal was

Defendant's motion to suppress wiretap evidence,[1] and Defendant's motion to wiretap suppress the wiretap evidence is denied. Having not succeeded in suppressing any evidence, there is no "erroneously denied suppression motion" which contributed to the Defendant's "decision to plead guilty." *See United States v. Lustig*, 830 F.3d 1075, 1087 (9th Cir. 2016). Defendant has not prevailed on appeal and is not entitled to withdraw his plea under Rule 11(a)(2). The Judgment entered on April 23, 2014 is reentered for the purposes of any further appeal.[2]

IT IS HEREBY ORDERED that the motions to suppress wiretap evidence (ECF Nos. 57, 351) are denied. The Judgment entered on April 23, 2014 is hereby reentered for the purposes of any further appeal. Any Notice of Appeal must be filed "within 14 days" of this order. Fed. R. App. P. 4 (b)(1).

DATED: October 25, 2018

**WILLIAM Q. HAYES**
United States District Judge

---

[1] ECF No. 57.

[2] The minute entry (ECF No. 282) entered on October 4, 2016 is vacated.